Good morning, Ben Coleman for Ms. Ross. We're just going to divide the time up ten minutes apiece and if I can save a minute or two for rebuttal, I'll do that. I'd like to start off with the silence issue. It's the first issue raised in our briefs. It's our position that there was both constitutional error and if not constitutional error, then federal evidentiary error in the admission of the silence evidence. I'll start off with our constitutional error standard. It's our position that in this case, the due process clause of the Fifth Amendment was violated when the agents essentially told Ms. Ross that she could terminate the questioning by asking him to leave and that it was her decision whether she wanted to obtain a lawyer. And in that particular type of situation, it doesn't matter whether you're talking about pre-arrest or post-arrest, there is a due process violation and we rely on the Callan case from this Court, which indicates that when someone is advised of rights in an interrogation by law enforcement, and even in the pre-arrest context, which was the Callan case, that that is a due process violation. Sotomayor You're referring to the issue involving the admission of evidence of the right to counsel, that issue? ROSS Right. The initial ---- Sotomayor Well, didn't — wasn't that opened up by defense counsel when he asked about the polygraph? ROSS That's the government's position. It's our position that the open-the-door rule, I guess, or the curative admissibility doctrine does not apply in this particular situation. In particular, the government, when the polygraph testimony was introduced on the agents' cross-examination by the defense lawyer, the government never objected. The government didn't ask to — for a curative instruction, didn't ask to strike the testimony, didn't even offer any type of objection at all. When there is no objection, the government cannot then come back and say under the curative admissibility doctrine that they wanted to introduce this evidence. Kagan What case do you cite for that proposition, that there has to be an objection at the time? ROSS We cited the Tenth Circuit case. I think it was Duran. Let me just get it. I think — I believe it was Duran. In that case, it was a defendant who was seeking to use the open-the-door rule, and the Tenth Circuit said that, well, you didn't your — yes, it's the Duran case, which is at page 16 of our briefs, where the Tenth Circuit said that the defendant's — what the defendant should have done is he should have objected. He couldn't sit back, sort of lay in the weeds, and then later try to use the curative admissibility doctrine to get into some other inadmissible evidence. Kagan Do we have any Ninth Circuit law on that? ROSS I don't believe so. The Tenth Circuit's Duran case was the only one that I could find on that. But even if you — even if the Court does not believe that an objection  to curative admissibility or open-the-door theory, the courts have said that that doctrine is not to be used as a sword. It's a shield. This is the type of extremely highly prejudicial evidence that would not — that would not be allowed to come in through an open-the-door-type theory. Kagan Do how do you think the government should have — I mean, you're saying the government should have objected, but even if it didn't, it was still error.       I'm saying that the government should have objected to the fact that the jury was recommending your clients not taking the polygraph. ROSS In this particular situation, I believe the government's concern was that the FBI engaged in any type of misconduct in this case, or the judge could have struck the polygraph testimony. So I'm ordering you to disregard the testimony about the polygraph. That would have been much more — a much more tolerable situation than bringing in highly prejudicial evidence that Ms. Ross terminated the question and invoked her right to counsel. And that's what the cases that we've cited, the curative admissibility cases, most of them are from other circuits. This Court has maybe one curative admissibility case, but most of the cases from the other circuits talk about, for example, the Seventh Circuit case, Manuel, talk about that the rules of evidence do not simply evaporate when one party opens the door on an issue. Even after the door has been opened, the district court is required to weigh the need for and value of curative admissibility of previously inadmissible evidence, including whether a limiting instruction to the jury would obviate the need for any new delay, confusion and prejudice. I mean, that's exactly what we're talking about here. This is extremely — Kennedy. That case goes so far as to say that the government is under an obligation to make an objection under those circumstances? That case doesn't. It's the Tenth Circuit case in Durand that we believe stands for that proposition. But even if the Court is going to say that the government didn't have to object, the remedy here for the government, rather than shredding on Ms. Ross's constitutional rights, the remedy, an easy remedy would have been a curative instruction from the district court. And that was just totally — you know, the defense attorney objected when this line of questioning was started by the prosecutor. The prosecutor had an opportunity to let the Court know what it was going to be doing, and the prosecutor just continued to go with the silence, this highly prejudicial silence testimony. So it's our position that, number one, it's constitutional error. At the very least, it's evidentiary error under Hale, and that the error in this case was not harmless. In particular, I would note that we believe that the defense in this case was as strong, at least as the defense in Velarde Gomez, which was an opinion written by Your Honor, Judge Wardlaw, where this Court held that there was harmful silence error in that particular case. In that case, the defendant, he had some, I would say, less than compelling testimony that when he was found with a large quantity of drugs in his car at the border, he had testified, I believe, that he went down to Mexico to see a prostitute. It was a very sort of suspicious type of story. And in addition, the gas tank in that vehicle was essentially full with the drugs, so the car could only go maybe 10 miles or something like that. Even with all those sort of incriminating facts and circumstances, this Court still held that the silence evidence, because this type of evidence is so prejudicial, that it was not harmless error. So we certainly urge the Court to follow that reasoning in this particular instance. In addition, I'd just like to move off the silence evidence briefly and get into, with the little remaining time I have, some of the other sort of cumulative error that we've alleged in our essentially our second argument, which has a number of different errors. In particular, again, I think Judge Wardlaw just wrote an opinion in the Combs case, which talks about improper cross-examination of a defendant. In this particular case, we have the same type of cross-examination tactics of Ms. Ross while she testified. And in particular, like the Combs case, the district court at one point actually asked the defendant whether she was in court when the government agent, the FBI agent, testified. So he almost took part in the improper questioning, which is very similar to what happened in the Combs case as well, where the district court also sort of took part in the improper questioning. And so we think under Combs, Geston, or Geston, as Ms. Ross pronounced, and Sanchez, that line of cases that this Court has articulated over the past few years, that the same type of improper cross-examination was done here. In addition, the government concedes, I believe in their brief, that the testimony about Ms. Ross being fired, that that, from the, from her job, because the bank wanted her fired, that that evidence was improperly admitted. And again, it's this type of evidence that's being introduced about why other individuals believe or have the was guilty, that that's extremely prejudicial-type evidence. And you start to accumulate all these errors, the silence testimony, the improper cross-examination of Ms. Ross, and this testimony about her being fired, that the cumulative effect of these types of errors is to improperly and unfairly impeach her credibility. But even if we find all those errors, how do you respond to the government's argument that there was overwhelming evidence of guilt in this case? Well, it's our position that the evidence wasn't overwhelming. Certainly, if you looked at the Sanchez case, in that particular case, when this court found that that type of improper cross-examination led to a harmful error, the defendant in that case took the stand, just like Ms. Ross took the stand, offered an exculpatory version of the events. When credibility is paramount, when it's the defendant's credibility that's on the line, and the defendant actually takes the stand and offers exculpatory reasons for that, just basically that she's not guilty, and those types of situations where credibility is paramount, that the error is not harmless, and particularly when you accumulate all these various errors that we're talking about. I mean, in this case, again, you know, we had relied on the Hale case, where the Supreme Court found that the evidence in the robbery case, that the silence evidence being introduced was harmful error. In that case, I think the evidence was stronger against that particular defendant than the evidence against Ms. Ross was. So, and again, the Sanchez case, there was a cooperating witness who testified against the defendant, and there were problems with the defendant's testimony, but this Court still found harmful error. And what I'd like to do is reserve the remaining time for rebuttal unless there are any other questions. If you'll do so. Robert Kitson, I'm appearing for Mr. Sutton. And I'd like to also keep some of my time for rebuttal. Mr. Sutton's main argument is driven towards what happened on the cross-examination of the only witness that he called in this case, a man named LaFont Tagger, who had pleaded guilty to the robbery of the charge in the indictment. To start off with, it has to be noted that Mr. Sutton had a defense in this case. Mr. Sutton is 5'2", and the government witnesses who testified both testified that the robbers were approximately 6 feet tall. And we're talking about witnesses that had plenty of opportunity to observe. One of them was a man named Duck Fan. He was the second person on the maintenance crew that evening. He was inside the bank when the robbers were there. Mr. Fan is 5'5". He testified that both robbers were taller than he was. The second witness was a woman named Lily Garcia, who observed the robbery as it was occurring, who narrated it to the police on the 911 call, who saw the robbers in relation to each other, in relation to the people in the bank, saw them running across the parking lot to the getaway car, and therefore also saw them in relation to the car. She testified that both robbers were 6 feet tall, or approximately 6 feet tall. The uncontradicted evidence at trial, Mr. Sutton's physical appearance at trial, showed that he was clearly 5'2", or 5'3". So there was a defense in this case. Now, yes, there was also physical evidence that's tied into the crime, or that the government said tied into the crime. There was testimony about the phone records. But Mr. Sutton had a right to present the defense that he had without having it destroyed by unfair means by counsel for the government. Counsel for the government took Mr. Sutton's alleged gang membership and threw it around as if it had no, you know, no possibility of being unduly prejudicial, when in fact that seems to have been its main purpose. I mean... Well, it's probable that the government failed to connect up the two in terms of gang membership, but what's the harm? What's the prejudice? The prejudice in this case, as the – as this Court has held, is that when you're dealing with gang membership evidence, there's a significant risk that a jury will equate membership in a gang with guilt of the crimes charged. And now, there are certainly times when gang membership evidence is appropriate. This Court has held it, the Supreme Court has held it, and that's particularly on the issue of bias, on the issue of motive, and occasionally on the issue of identification, perhaps. But in this case, it was never even told to the jury which gang was being talked about. The prosecutors didn't care. They didn't care which gang it was. All they were doing was throwing it up there. If you ask that during the cross-examination of Ms. Ross, it was some gang called 116th Street. During the application to the Court to allow the gang expert to testify, it was a gang called the 5 Triavlon Crips. During the testimony of Mr. Taggart, it's Grape Street. Now, the prosecution said that they had this gang expert who was going to come in, he was going to clear it up, he was going to show that Mr. Taggart was a member of the same gang as Mr. Sutton. That was going to tie it all together. That was going to make the evidence admissible. And that never happened. That never happened. The prosecutors simply decided to let the mess stay a mess because it benefited them, because it made Mr. Sutton look so bad. At least that's the way that the record reads to me. And I think that that's a fair reading of the record, considering that they apparently had within their ability to call a witness who could have clarified this. They represented to the Court that they had a witness who would make this evidence relevant, who would show that Mr. Taggart was biased. Well, it wasn't – suppose we found it was an error. Again, you face the question of whether it was harmless or not. And that's where you come back to the issue of did he have a viable defense. And considering that you had two government eyewitnesses basically testifying, you know, to irreconcilable facts with the rest of the prosecution's case. Prosecution proceeded on the theory and claimed that they proved that Mr. Sutton was inside the bank. And they clearly said that another man named Daniel Simmons, I think, was the getaway driver. They never proceeded on any theory other than Mr. Sutton was one of the robbers who entered the bank. They called one of the government witnesses, Duff Fan. He's 5'5". All right. He testified that he's 1 meter, 64 centimeters. That comes back to 5'5". All right. He testified both robbers are taller. Mr. Sutton is clearly shorter. All right. And then you have Lily Garcia, the witness who narrated it. And the 911 call shows that she's watching it happen. She's, you know, she's looking across a dark parking lot into a lit lobby. She sees everybody. She sees them run out. You know, she's telling the police, this is what's happening. Here's how many they are. Here's what the woman is doing over there, et cetera, et cetera. And she sees them in relation, even though there's distance, she sees them in relation to each other, to other people, and to objects that are commonly understood. I mean, it's a Toyota sedan. It's a Celara that they get into. She can see whether some guy is unusually short. And she says 6 feet. So there is a defense here. And when – and what ended up happening was that – and Mr. Taggart also testified. Mr. Sutton wasn't there. That was the import of his testimony. Now, Mr. – yeah, sure, Mr. Taggart had to be impeached with all of his prior inconsistent statements. There's no question that that would have been fair in and of itself. But instead, it was gang evidence and insinuations through this repetition of you're testifying on your oath. Isn't this your oath that you're testifying? Didn't you stop that when the judge admonished him about his plea under oath? It was consistent hammering on the witness. But he knocked that off, didn't he, when the judge admonished him about – After the 14th time. Everybody knows he's under oath. I'm sorry. Excuse me, Your Honor. I'm sorry. Didn't the prosecutor stop that when the judge admonished him? He stopped for a while. He came back to it and then did stop when he was stopped a second time. It was objected to early. The first series of questions now – and let me go back. The first series of questions weren't objected to, and it's not uncommon to hear oath-type questions be asked in a trial. Okay? Once or twice, that's one thing. That's sort of telegraphing the importance of the proceedings. That's, you know, sort of a time-honored method. Fourteen times is telegraphing personal disbelief of what the witness is saying. There's no other way to read that after the 14th time. And, in fact, it was 18 times in this case because there were four other questions about proceedings other than the one – other than the trial where the oath was being thrown around. And the question was, did the judge have the right to do that?    The question is, did the judge have the right to do that? Because credibility was a central issue. Credibility is a central issue, and prior – impeachment prior and consistent statements would have been fine. Bias evidence would have been fine had they called this gang expert to go to his credibility. But, you know, unduly prejudicial, irrelevant evidence going to credibility doesn't make it any more admissible. Were you at the trial? I'm sorry? Were you the trial lawyer? No, I was not. Did Judge – do you know whether Judge Ray presided over the entire proceedings? He did. Including the sentencing? Yes. Counsel, you're down to under two minutes. I'd like to reserve the right. You may do so. Thank you, Your Honor. You'll hear from the government. May it please the Court. Andrea Rusty for the United States. I'll first address Ross's argument regarding the invocation of her right to counsel. I would first like to clear up a factual issue, which is Ross was not advised of her rights during either the first or second interview. In their excerpts, in their reply brief, Ross's counsel cites to Agent Nordstrom's FBI 302 as evidence that she was advised of her rights. She was not, however, advised of her rights. And in reviewing Agent Nordstrom's testimony, she was actually cross-examined by defense counsel as to why she was not advised of her rights. So I think that that distinguishes this case from the Kalin or Kalin case and makes it more similar to the Beckman case, which is what the government argued in its brief. I think that this case was not a violation of her Fifth Amendment rights because the government made no substantive use of the evidence of her right to counsel. It was not argued in closing argument. It was never mentioned other than the four questions of the agent to clear up the The other issue raised by Ross's counsel was the issue of cumulative error. And I would argue that even if the Court finds that one or two of these isolated instances constituted error, there was overwhelming evidence against Defendant Ross in this case. The government admitted evidence of phone calls prior to and during the robbery between Sutton and Ross, the eyewitness testimony of Liliana Garcia, and Ross's testimony that she had basically lied to the FBI in her first interview, that she said she never talked to Sutton during that evening, that nobody knew that she was in the bank. And so even if during the course of this entire trial there were isolated instances of error, I think looking at it on the whole, any error would be harmless. Well, you're still on Ross. What's your response to the argument made by Mr. Coleman with respect to the Seventh and Tenth Circuit cases, or at least the Tenth Circuit case in particular, which suggested that the government itself had the obligation to object? Well, I have two responses. The first is that we did not handle this as – I guess the government's looking at this in line of the fair response cases, not in the curative admissibility cases. I think for the curative admissibility doctrine to apply, you have to have sort of one piece of inadmissible evidence that is attempted to be cured by another piece of evidence. And I think that whether or not the question about the polygraph was inadmissible, the government did not treat it as such. And so I don't think the government had an obligation to object here. That, of course, would have been one strategy, and I think that the government could have objected or could have asked for an instruction. I think, however, the prosecutor here did not want to call further attention to the polygraph issue and instead asked very limited questions about why a polygraph was not given. So I don't think there was an obligation here for counsel to object. If there are no further questions on Defendant Ross, I'll turn to Defendant Sutton. On the issue of the gang evidence, it is true that government counsel made a motion prior to trial, and it was part of the government's trial memo, that it intended or perhaps would call a gang expert who would testify that Sutton, Tagger, and Simmons were all members of the Five Trey Avalon Crips. The government, however, elected not to pursue that. And I think that while the gang issue was brought out at trial, it was not brought out to show Tagger's bias or Sutton's bias. What the government was attempting to do in its cross-examination of Tagger was to show his inconsistent statements. For instance, he had told the FBI that Sutton was a Grape Street gang member. The government knew that that was not true. So in cross-examining him, the government asked, did you tell them that these three guys were from Grape Street? And at which point Tagger says, I didn't tell them about a gang. And then the government follows up, you know, is Grape Street a gang? Later — Was that a deposition or in a transcript? Did the jury know about that prior statement? The jury, I believe that Agent Author testified that, and I can look, I think that Agent Author testified that, that all three were — well, first, Tagger testified on direct — No. The issue here is impeachment of a prior statement. But is the prior statement in evidence, is my question. Many of the prior statements, some of them are in evidence. Some of them were his — for instance, his taped interview with the police department was in evidence, and he gave one story there. Then the agent — But focusing on the gang issue, you heard counsel say with, I think, some force that the mere mention of a gang affiliation can be very prejudicial. And it's obvious that the government, and you're not even saying this, the government did not connect up any connection between the two with respect to common gang membership. Right. I think that what the government was attempting to do here was to show that what had happened in regard to the gang evidence was that Tagger had told several different stories, and he at one point told the FBI that Sutton was a Grape Street gang member. Okay. And you're telling me that that particular statement is in evidence. Yes. And I can actually find the site. It was to special agent author. And the government knew that that was not true, and so counsel was trying to elicit the fact that, you know, you've told something different at every stage, and when they asked Tagger the question, he said, I never told them Sutton was a Grape Street gang member. I told them Matthew was a Grape Street gang member, which, again, was also not true. The government could have introduced evidence that these three men were all part of the same gang, and that that's why Tagger was testifying as he did. The government elected not to do that, and the government did not argue that in closing. Instead, the government argued that Tagger did not want to be labeled a snitch, and that's why he testified as he did, not that he was a fellow gang member with Sutton and Simmons. I just don't understand what you're saying now. It seems to me to be a little bit inconsistent with the, I guess it was a motion in limine, and what the government represented to the court at that time. And at the time, what was before the court was that the government had said that they were going to elicit this testimony, whether or not Mr. Tagger is a gang member. And the government and the court ruled, well, if you're going to do that, you have to connect it up. And they went ahead and did it, and never connected it up. It seems inconsistent with what you're describing right now. I don't, well. I mean, they planned to bring it. It was, they told the defense they were going to introduce that evidence, and they did it. And they didn't do what the court said they had to do in order to introduce it. I think that the government actually did not intend to introduce that evidence. The gang evidence that came out during Tagger's cross-examination was very minimal, and the government didn't, never asked him if he was a fellow gang member with Sutton. They asked him if he told the FBI Sutton was a gang member. But I think Judge Wardlaw's concern, which I share, by the way, is the government seems to be going down a path of promising the court to connect up the common membership, and then they abandon it. That it's true that the government intended to introduce this expert. While this is outside the record, I can tell you the government did not do it. Well, don't tell us what's outside the record. I'll tell you what the government attorney said to the court. I'm going to ask him, and I'm going to lay the proper foundation if Mr. Bourne and the court would like me to bring in this expert. That was what the trial counsel said to the court. To me, that seems like a pretty strong representation. I don't want to know your excuses why you didn't live up to it that aren't in the record. I think that government counsel at that time did intend to call the gang expert. He was on the government's witness list. The government counsel elected not to. And he, in his cross-examination of Tagger, I think that he was not intending to use the gang evidence to show bias. He was attempting, and maybe he was not successful in this, but he was attempting to show Tagger's inconsistent statements, to show how Tagger had told a different story and had identified Sutton as being a Grape Street gang member, which he knew was not true. So I don't, I mean, I understand the court's concern in that this gang evidence came before the jury. I do, however, think that the government counsel was not intending to lay the foundation and introduce it as evidence of bias. Now, if he was, he would have called the expert. I think he had the ability to do that. Aren't we supposed to look at what happened? Not, I mean, you made the same argument in response to the prior error with respect to the questioning Ms. Ross about her silence, that, oh, no, the government in its head thought it was doing something else, even though what we're looking at is a record that shows, that conflicts with what you're saying was the government's intention. And I don't think we can review the government's trial lawyer's intention. We're supposed to look at the record. Well, I think in looking at the specific, the two areas where the gang testimony was talked about, the government asked Tagger if Sutton, Simmons, and Matthew were all from Grape Street. Tagger responded. The government asked that question. You're telling me the government wasn't aware that Grape Street was a gang? No, I'm sure the government was aware. Right. So they're asking, are they a member of a gang? Well, he's also asking, because of the fact that Tagger had told them that Sutton and Simmons were from Grape Street, and then on direct, Tagger said that, no, none of these people were from Grape Street. That wasn't their territory. They had dropped Sutton off there to sell drugs, but it was where Matthew was from. So I think there's a dual purpose there. Obviously, the government, you know, was aware of different gang memberships, but I also think he was asking to sort of clarify, to show that Tagger had again told a different story on direct exam. And in response, Tagger says, I never told them about no gang, and the government does pursue it with only one question, and then the government moves on to a different topic. I mean, I guess, I think that what, I think the fact that the government was not attempting to introduce this evidence to show bias is clear by how limited the questions are. I mean, there's that question, and then there's a later question where the government says, you told the FBI that Sutton was a Grape Street gang member. And Tagger says, I never told them he was a Grape Street gang member. I told them Matthew was a Grape Street gang member. And those are really the only two, in the entire, you know, 40-plus pages of cross-examination, those are the only two mentions of it. Ross, both in her direct exam and in her closing argument, mentions the gang, mentions gang issues. She mentioned she was going to a gang party. But other than that, there really is no mention of gang evidence during the course of the trial, and the government did not argue it in closing. They didn't argue they were the members of the same gang or the fact that they were gang members made Tagger biased. The only thing the government argued was that Tagger didn't want to be labeled a snitch in prison, and that's why he testified the way that he did. If the Court has no further questions, I will submit. What about the second issue that Mr. Kitson argued having to do with the 14, I guess, 18 repetitions of your under oath? Isn't that a little excessive? I think that, I apologize. While perhaps not the best strategy, I think that the government counsel here was attempting to demonstrate that Tagger had lied at every point and told a different story. The first five questions. But where's the dividing line between highlighting inconsistencies and sending the message that the government disbelieves this witness, which is a no-no, right? I think that, as Your Honor pointed out, when the district court judge told government counsel to forget that and go on to something else, he stopped. The first five oath questions, there was no objection. Then there was another question where he said you are under oath, and defense counsel objected and the Court actually overruled it. So I think those first six questions, the government counsel had no reason to believe this was an improper way to proceed. Then there was two additional questions where there was no objection. The law is that this is an improper way to proceed. I'm sorry. The government had no reason to know that this was an improper way to proceed, other than that the law is it's an improper way to proceed. The cases don't make clear that it's improper to ask someone about their oath. Right. But 14 times. It may have been excessive. I think that at the point the Court told him to stop doing it, government counsel stopped and did not do it again. And I also, the government counsel did not do this with any other witnesses. I think it was the sole witness for the defense of Sutton. That's correct. So the government didn't have the opportunity to do it with any other Sutton defense witnesses. That is true. Obviously, the Court feels that this was not a proper way to question this witness. Again, I think that, first of all, I don't think it was misconduct. I don't think government counsel was attempting to do something that was improper. I think whether it was inartful is a different issue. He was trying to demonstrate that Taggart had lied on so many different occasions and had lied on his — in his direct testimony about his plea agreement and something that he had testified to and signed under oath. I think given the scope of the cross-examination here, and this was primarily in the first few pages of the cross-examination and then government counsel took a different tact, I don't think that it is harmful. I think that looking in the context of the trial as a whole, that the evidence against Sutton was so overwhelming that — That's what always perplexes me when the government overreaches like that. It's — if they have a solid case, which is really, bottom line, what you're arguing, because the evidence — the other evidence was so overwhelming, why are they — why did they — maybe I'm asking you to discern their intent — that there's no need to go to this extent and do — ask the proper questions and some of the other error that's in this case. There's no need to do that when it has the solid case that you're representing it had at this point. So why is he doing it? If it isn't harmful, why is he doing it? He's doing it because he thinks it's going to help his case. That is true. This was a very — even though the government's evidence was strong, this was a very hard-fought case, and it was a very aggressive prosecutor, and this was his strategy. While at times may not have been the best strategy or he may have come very close to the line, and that's sort of the only explanation I can offer. If the court has no additional questions, I will submit. Thank you. Thank you, counsel. Your side has about two minutes between you, so go at it. A couple of quick points. I think the government said, well, to the extent that maybe there were some errors committed here that they were harmless. One thing that I want to emphasize, which I didn't mention before, was the Geston case, which was the case with the improper cross-examination of the defendant in this Combs-Sanchez-Geston trilogy of cases. That was — this Court reversed under plain error review, and that was the only error in the case. In this case, we're contending multiple errors, and it's not plain error review. So if there's a reversal in Geston under the very highly deferential plain error review, I don't believe we can say that the errors here are considered harmless. And, of course, again, we believe, for example, Velarde Gomez, a case where really the defense testimony was not overwhelming. I mean, his version of the — the exculpatory version of the events was not all that believable, and this Court still found harmful error. I wanted to correct one thing that I misstated. The Duran case, which was — I think I had said it's a Tenth Circuit case. It's really an Eighth Circuit case, but it's cited on page 16. That's the case that makes it appear, at least, that the government should have objected here if they wanted to use curative admissibility. And one final thing is that the government said that Ms. Ross was not informed of her rights during that second interview. And we are relying on the FBI 302 report at page 7 of the excerpts of record. This report was introduced at the — in the district court when this — when the defense lawyer was making this objection. So this report is in the record. And the last paragraph of that report on page 7 says, at one point, Kerrle, who was Ms. Ross's friend who was there at the interview, at one point, Kerrle asked if Ross was under arrest. And the interviewing agents explained that she was not, and that she could leave at any time or ask the agents to leave. He asked if she would be arrested at some point and was told that she most likely would be arrested at a later date. He then said — he then said she should get a lawyer and was told that it was her decision to make, not his. Ross then said she would prefer to talk with the lawyer before any further questioning. So what the agents have done is they've told her, you can ask us to leave if you want, and it's your decision whether you want to get a lawyer. But now they're saying — they put her in a catch-22. So she says, okay, I want you to leave, I want to get a lawyer, and I don't want to ask any further questions. And that's exactly the catch-22 that Doyle and Cowan say is violative of the due process clause. Thank you, counsel. The case just argued will be submitted for decision. And we will now hear argument in consortium versus credit data.
judges: O'scannlain, Wardlaw, Lovell